IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SARAH O'CONNOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-343 (RDA/WEF) |
| | ) | |
| THE LINCOLN NATIONAL | ) | |
| LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on cross-motions for summary judgment filed by the parties.[1]  *See* Dkt. Nos. 15 ("Defendant's Motion"); 17 ("Plaintiff's Motion").  The Court has dispensed with oral argument as it would not aid in the decisional process.  Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter has been fully briefed and is now ripe for disposition. Considering the Motions together with the Memoranda in Support (Dkt. Nos. 16; 18), the parties' Oppositions (Dkt. Nos. 24; 25), and the parties' Replies (Dkt. Nos. 26; 27), it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED and it is further ORDERED that Plaintiff's Motion for Summary Judgment is DENIED for the reasons that follow.

I. BACKGROUND

A. Procedural Background

On March 15, 2023, Plaintiff filed her Complaint in this action seeking disability benefits under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.*

---

[1] For ease of reference, Plaintiff Sarah O'Connor will be referred to as "Plaintiff" and Defendant Lincoln National Life Insurance Company, formerly known as Liberty Life Assurance Company of Boston, Dkt. 16 at 2, will be referred to as "Defendant."

Dkt. 1.  On May 30, 2023, Defendant filed its Answer.  Dkt. 7.  Thereafter, the Court adopted a schedule for the filing of the Administrative Record and Dispositive Motions.  Dkt. 12.  The Administrative Record was filed on September 15, 2023.  Dkt. 13.  On October 17, 2023, Plaintiff and Defendant filed cross Motions for Summary Judgment, Dkt. Nos. 15; 17.  The parties filed Oppositions to those Motions on January 5, 2024, Dkt. Nos. 24; 25, and Replies on January 11, 2024, Dkt. Nos. 26; 27.

B.  Undisputed Facts

Before analyzing the Motions at issue, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact.  Fed. R. Civ. P. Rule 56.  To this end, Defendant set forth a statement of undisputed material facts that it contends are undisputed and supported by record citations as required by the Local Rules.  Dkt. 16 at 4-14; E.D. Va. L.R. 56(B) (requiring the moving party to list all material facts as to which there is no genuine issue and to cite to portions of the record).  Plaintiff likewise provided a statement of material facts in her own Motion but failed to specify whether she believes those facts to be undisputed.[2]  Dkt. 18 at 3-8.  The Rules next require a nonmovant to respond to a movant's statement of undisputed facts by "listing all material facts to which it is contended that there exists a genuine dispute" with citations to the record.  L.R. 56(B).  In their respective Oppositions, neither party has listed material facts to which they assert exists a

---

[2] It is also unclear whether Plaintiff's Motion is a motion for summary judgment or a motion for judgment on the pleadings, which would require the application of a different legal standard.  The Motion itself states that Plaintiff "hereby moves for Summary Judgment," Dkt. 17 at 1, but the body of her Memorandum in Support states that Plaintiff "submits this brief in support of her Motion for Judgement on the Record," Dkt. 18 at 4.  Moreover, the text of the docket entries for the Motion and accompanying Memorandum characterizes it as a "Motion for Judgment on the Pleadings."  *See* Dkt. Nos. 17; 18.  Nevertheless, based on the text of the Motion itself, Dkt. 17 at 1, the Court will construe Plaintiff's Motion as a cross-motion for summary judgment.

genuine dispute. *See* Dkt. Nos. 24; 25. As Defendant explains, "the dispute is purely one of plan interpretation, there truly are no material facts in dispute." Dkt. 16 at 18 n.5.

The claims at issue here involve the calculation of disability benefits arising under ERISA. Dkt. 1. Courts recognize that, in an ERISA benefits case, "a motion for summary judgment is, in most respects, merely a conduit to bring the legal question before the district court, and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists do not apply." *Schkloven v. Hartford Life & Accident Ins. Co.*, 2022 WL 2869266, at * 14 (D. Md. July 21, 2022) (internal citations and quotations omitted); *Keith v. Fed. Express Corp. LTD Plan*, 2010 WL 1524373, at *4 n.4 (W.D. Va. Apr. 15, 2010) (same). Accordingly, the following statement of facts is derived from a careful review of (i) Defendant's "Undisputed Material Facts," (ii) Plaintiff's "Statement of Material Facts," and (iii) the Administrative Record as a whole.[3] The undisputed facts are as follows:

1. At the time of her disability claim, Plaintiff was employed as a Regional Builder Sales Consultant at Wells Fargo & Company ("Wells Fargo"). AR1.

*The Group Long-Term Disability Policy*

2. Defendant issues a group Long-Term Disability ("LTD") insurance policy (the "Group Policy") to Wells Fargo to insure the company's LTD Plan (the "Plan"). AR1075.

3. Under the Group Policy, Defendant will "pay [a] Covered Person a Monthly benefit" after "receiv[ing] Proof that [the] Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician." AR1097.

---

[3] The Administrative Record was docketed in its entirety in nine parts in Docket Entries 13-1 through 13-9. Following the parties' naming convention, references to the Administrative Record will be cited as "AR" followed by the specific page number of the record citation.

4. A claimant's monthly benefits are paid as a percentage of "Basic Monthly Earnings" ("BME"). AR1078. Monthly benefits are calculated by multiplying the claimant's BME by the benefit percentage shown in the Group Policy's Schedule of Benefits, AR1097, which provides for a basic LTD benefit percentage of 50% of pay or an optional buy-up benefit percentage of 65% of pay, AR1078.

5. The definition of BME under the Group Policy differs depending on the claimant's "Job Class Code," which distinguishes employees based on the various compensation schemes for different types of employees. AR1081. For Job Class Code 1 and 5 employees, who earn commissions and other incentive-based pay, BME is "a benefits base, up to a maximum of $500,000 annually. Benefits base is calculated quarterly and earnings are annualized based on base salary and incentives, incentive bonuses and/or commissions paid in the last 12 months, divided by the number of months with earnings greater than $0." *Id.* For Job Class Code 2 employees, who are paid on an hourly or salary basis, BME is "covered pay in effect on the day before the initial date of the Employee's Disability. Covered pay is the annual base salary plus eligible certified incentive compensation that has been paid in the last 12 months." *Id.*

6. The Group Policy states that "Liberty shall possess the authority to construe the terms of this policy and to determine benefit eligibility hereunder." AR1114. Likewise, the 2021 Wells Fargo Benefits Book, which explains the benefits process to employees, states that "[Defendant] has the discretionary authority to administer claims and interpret benefits under the LTD Plan." AR1186.

7. Under Defendant's interpretation of the Group Policy, the Benefits Base quarterly earnings calculation for BME used to determine monthly LTD benefits for Job Class Codes 1 and 5 employees is the calculation completed in the quarter prior to the initial date of a claimant's

disability. AR49 ("[BME] per the policy does not include future or upcoming quarterly benefit base earnings.").

8. In addition to the Group Policy, Wells Fargo makes the Wells Fargo Benefits Book available to its employees. AR48. The Benefits Book contains Summary Plan Descriptions ("SPDs") for certain benefit plans that the company sponsors for eligible employees. AR1137. "An SPD explains [an eligible employee's] benefits and rights under the corresponding benefit plan. Every attempt has been made to make the SPDs easy to understand, informative, and as accurate as possible." *Id.* Regarding the timing of when LTD benefits are to be calculated, the SPD for the LTD Plan states, *inter alia*, that:

> **Covered Pay**
> Your LTD benefit is based on your covered pay in effect on the day before the initial date of your disability. . . .
>
> **Benefit Amount**
> LTD benefits are based on your covered pay on the day before the initial date of disability.

AR1189-90.

*Plaintiff's Employment History with Wells Fargo*

9. Plaintiff began working with Wells Fargo on March 15, 2016 in a Job Class Code 5 position. AR1; AR917.

10. Plaintiff transitioned to a Job Class Code 2 position at Wells Fargo in late 2018. AR917.

11. Plaintiff terminated her employment with Wells Fargo on November 29, 2019. AR19; AR918.

12. Wells Fargo rehired her on January 21, 2020 as a Regional Builder Sales Consultant, which is a Job class Code 5 position under the Group Policy. AR1; AR19. Thus, at the time of her disability claim, Plaintiff was a Job Class Code 5 employee. AR1.

13.     Importantly, Plaintiff did not work for the period between leaving the Job Class Code 2 position on November 29, 2019 and beginning the Job Class Code 5 position on January 21, 2020. AR19.

*Plaintiff's Disability Claim*

14.     On January 7, 2021, Plaintiff had surgery to remove squamous cell carcinoma from her tongue, the floor of her mouth and the lymph nodes on both sides of her neck. AR27; AR118. Plaintiff also had a tracheostomy performed due to extensive swelling of the tongue, after which she could not speak and contracted an infection. AR27. As a result, Plaintiff's last work date was February 7, 2021, and her leave began on February 8, 2021. AR1.

15.     Plaintiff subsequently filed a claim for Short Term Disability ("STD") benefits that Defendant approved on March 5, 2021. AR1053.

16.     Plaintiff's STD claim eventually became a LTD claim for benefits, and Defendant approved the claim on July 15, 2021, AR19, and memorialized the decision in a July 16, 2021 letter, stating that Plaintiff's LTD benefits would begin on August 9, 2021. AR909-10.

17.     When Plaintiff submitted her claim for LTD benefits, she was a Job Class Code 5 employee and opted for the 65% buy-up benefit. AR1-2; AR917.

18.     As such, Defendant calculated Plaintiff's monthly LTD benefits by (1) totaling her base salary and incentives, incentive bonuses and/or commissions paid in Q1 2020 – Q4 2020 ($152,478.10), (2) dividing that figure by the number of months with earnings greater than $0, which was 11 months ($13,861.64), (3) annualizing the resulting figure by multiplying it by 12 months to generate Plaintiff's Benefits Base ($166,339.75), (4) dividing her Benefits Base by 12 months to generate Plaintiff's BME ($13,861.64), and (5) multiplying the BME by 65% to get Plaintiff's monthly LTD benefit amount ($9,010.07). AR640; AR19 ("$166,339.75 ANNUAL

6

SALARY AMOUNT / 12 = $13,861.65 MONTHLY PRE-DIS SALARY.  THE BENEFIT IS 65% OR $9,010.07."); AR1097.  Defendant used the Benefits Base quarterly earnings calculation for the quarter just prior to Plaintiff's initial date of disability – "earnings paid Q1 - Q4 2020 (166,339.75)."  AR8.

*Plaintiff's Request for Adjustment of her LTD Benefits Amount*

19. On June 14, 2022 and June 22, 2022, Plaintiff reached out to Defendant to request a recalculation of her monthly benefits using her Benefits Base quarterly earnings calculation for Q2 2020 to Q1 2021 rather than Q1 2020 to Q4 2020.  AR11 n.54; AR10-11 n.55; AR639 ("I am asking for my disability compensation [sic] be reviewed to use [sic] March – March ABBR vs Jan – Jan").  She explained that she did not start in her role as Regional Builder Sales Consultant until January 21, 2020,[4] resulting in a significant portion of what she would typically earn in a 12-month period being unaccounted for in the Q1 2020 to Q4 2020 calculation.  AR639 ("As I was new to this role in 2020, my rolling average is understated by more than 50% of my compensation.").  As such, Plaintiff asserted that a significant portion of her income was paid in Q1 of 2021, and that Defendant should recalculate her LTD benefits based on the Benefits Base calculation for Q2 2020 to Q1 2021.  *Id.*

20. If Defendant had used the Benefits Base quarterly earnings calculation for Q2 2020 to Q1 2021, her Benefits Base would have been $251,077.16 and her BME would have been $20,923.10.  AR647.

21. Defendant denied Plaintiff's request for her LTD benefits to be adjusted on October 14, 2022, stating that "We acknowledge that your benefit base increased during the next quarterly

---

[4] *See supra* ¶¶ 8-12 (explaining that Plaintiff terminated her employment with Wells Fargo on November 29, 2019, and that Wells Fargo rehired her on January 21, 2020 as a Regional Builder Sales Consultant).  AR19; AR918.

calculation. However, based on the onset date of your disability and the provisions listed above, your covered LTD pay cannot include earnings paid during the first quarter of 2021." AR640. The provisions referenced in this letter were copied from the SPD for the LTD Plan in the Wells Fargo Benefits Book and not the Group Policy. *Id.*; AR1189-90.

22. Defendant also notified Plaintiff of her right to request review of the denial. AR640-41.

23. On January 10, 2023, Plaintiff appealed the denial through counsel, explaining that the language Defendant quoted in the denial letter did not appear anywhere in the Group Policy itself, nor in any documents that Defendant provided to her when she requested a copy of her claim file. AR451-53. Plaintiff "[did] not dispute that [Defendant] initially calculated her benefits correctly when she first became disabled, using the quarterly benefits base in effect at that time." AR452. However, she asserted that the "plain and literal language of the policy" states that "[BME] is calculated on a quarterly basis." Based on this language, she argued that "[Defendant] was required under the terms of the policy to update her BME and thus ultimately her monthly disability benefit during the next quarter, when her benefits base was updated." AR452-53.

24. Defendant denied Plaintiff's appeal in a February 17, 2023 letter, explaining that "Covered pay, or [BME] are determined based on a covered person's pay in effect the day prior to the date of disability and are based on the last 12 months. [BME] per the policy does not include future or upcoming quarterly benefit base earnings." AR56. In this letter, Defendant included language from the Group Policy, as well as the Wells Fargo Benefits Book, to support its decision. AR54-58.

25. In the February 17, 2023 letter, Defendant also informed Plaintiff of her ability to initiate legal action. AR58.

8

26. That same day, Plaintiff's counsel requested a copy of her entire claim file, including "copies of all documents, records, and other information relevant to this claim for benefits." AR39.

27. On March 15, 2023, Plaintiff filed the instant lawsuit. Dkt. 1.

## II. LEGAL STANDARD

Summary judgment is appropriate where a court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 330 (1986). As district courts within the Fourth Circuit recognize, "ERISA actions are usually adjudicated on summary judgment rather than at trial." *Prowell v. UPS Flexible Benefits Plan*, No. CIV. L-10-3457, 2011 WL 51109291, at *3 (D. Md. Oct. 26, 2011) (citing *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260 (4th Cir. 2009)).

The Supreme Court has held that courts are "to review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). When "conducting *de novo* review of ERISA benefits determinations [the Court] should limit its review to the evidentiary record that was presented to the plan administrator or fiduciary." *Rupprecht v. Defendant Standard Life Ins. Co.*, 623 F. Supp. 3d 683, 693 (E.D. Va. 2022)). Further, the "court reviewing an ERISA claim under *de novo* review is concerned only with the 'correctness, not the reasonableness,' of the denial." *Id.* at 693 (internal citation omitted).

Where an ERISA plan grants the administrator or fiduciary "discretionary authority," however, then the reviewing "court evaluates the administrator's decision for abuse of discretion." *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Under the abuse of discretion standard, a court will uphold a discretionary determination provided that it is reasonable. *Champion v. Black & Decker (U.S.)*

9

*Inc.*, 550 F.3d 353, 359 (4th Cir. 2008). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997), even if the court would have reached a different conclusion on its own, *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004). "Substantial evidence consists of 'more than a mere scintilla but less than a preponderance' of evidence." *Hailey v. Verizon Commc'ns Long Term Disability Plan*, No. 1:13-CV-001528-GBL, 2014 WL 5421242, at *5 (E.D. Va. Oct. 22, 2014) (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984)).

## III.  ANALYSIS

Plaintiff moves this Court to grant summary judgment in her favor and against Defendant, awarding her additional LTD benefits that Defendant has allegedly withheld due to its failure to recalculate her LTD benefits every quarter. Dkt. 18 at 11-12. Defendant opposes Plaintiff's motion and seeks summary judgment in its favor. *See generally* Dkt. 16. Resolution of these cross motions for summary judgment raises two main issues for review: (1) whether the Court should analyze this appeal under *de novo* or abuse of discretion review; and (2) whether Defendant was correct in interpreting the Plan to provide for a one-time calculation of monthly benefits for Plaintiff's LTD claim, using the Benefits Base quarterly earnings calculation completed in the quarter prior to the initial date of disability. The Court will address each in turn.

### A. Standard of Review

The parties disagree concerning the appropriate standard of review for Plaintiff's request for LTD benefits recalculation. Plaintiff asserts that the Court should conduct a *de novo* review of her appeal, Dkt. 18 at 2-3, while Defendant contends that an abuse of discretion standard is

appropriate because the LTD Plan confers discretionary authority upon Defendant, Dkt. 16 at 14-18.

In making this inquiry, courts "examine the terms of the plan to determine if it vests in its administrators[,] discretion either to settle disputed eligibility questions or construe doubtful provisions of the Plan." *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). Courts "find discretionary authority in the administrator if the plan's language expressly creates discretionary authority." *Id.*

Here, the language of the Group Policy plainly confers discretionary authority upon Defendant: "Liberty shall possess the authority to construe the terms of this policy and to determine benefit eligibility hereunder." AR1113. Several courts have found that this exact language creates discretionary authority. *See* Dkt. 24 at 3-4 (collecting cases); *see, e.g.*, *Winters v. Liberty Life Assurance Co. of Bos.*, No. CV 20-11937-MLW, 2022 WL 6170588, at *7 (D. Mass. Oct. 7, 2022) ("This is a clear grant of discretionary authority to Liberty that would typically warrant use of the deferential arbitrary and capricious standard."); *see also Briggs v. Marriott Intl., Inc.*, 368 F. Supp. 2d 461, 472 (D. Md. 2005) ("The plain terms of this policy make it abundantly clear that Liberty has the sole discretionary decision-making authority over interpreting the Policy and eligibility for disability benefits").

To avoid a finding that the Group Policy confers discretionary authority, Plaintiff asserts that the LTD Plan is governed by Minnesota law and that discretionary clauses are unenforceable under Minn. Stat. Ann. § 60A.42. Dkt. 18 at 6. The Minnesota statute provides, *inter alia*, that:

> No policy . . . providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract or provide a standard of review that is inconsistent with the laws of this state, or less favorable to the enrollee when a claim is denied than a preponderance of the evidence standard.

11

Minn. Stat. Ann. § 60A.42. But, as Defendant notes, the Minnesota statute "applies to policies issued or renewed on or after January 1, 2016" because the statute became effective on that date. Dkt. 24 at 4; Minn. Stat. Ann. § 60A.42, Laws 2015, c. 59, § 1, eff. Jan. 1, 2016; *Winters*, 2022 WL 6170588, at *7. Under Minnesota law, "statutory changes are incorporated into a policy upon renewal, reinstatement, or reissue to become part of the terms thereafter." *Dallenbach v. Standard Ins. Co.*, No. 218CV02024GMNVCF, 2020 WL 1430036, at *3 (D. Nev. Mar. 24, 2020) (citing *Hauer v. Integrity Mut. Ins. Co.*, 352 N.W.2d 406, 408 (Minn. 1984)). Here, the Group Policy has not been renewed by Wells Fargo since it was issued on January 1, 2010 – six years prior to the Minnesota statute's effective date. AR1075. Thus, Minnesota law does not alter the conclusion here that the LTD Plan confers discretionary authority on Defendant and that abuse of discretion is the applicable standard of review.[5]

Accordingly, the Court concludes that abuse of discretion is the proper standard of review because the Plan confers discretion upon Defendant to construe its terms.

## B. Review of the Appeal

Having found that an abuse of discretion is the governing standard of review, the Court next reviews the evidence with respect to Defendant's interpretation of the Plan and its decision to

---

[5] Plaintiff also asserts that the doctrine of *contra proferentem* applies here. Dkt. 18 at 11; Dkt. 25 at 7-8. "Under that principle, 'insurance policies are to be liberally construed in favor [of] the assured and exceptions and exclusions are to be strictly construed against the insurer.'" *Allied Prop. & Cas. Ins. Co. v. Zenith Aviation, Inc.*, 336 F. Supp. 3d 607, 611 (E.D. Va. 2018) (quoting *United Serv. Auto Ass'n v. Pinkard*, 356 F.2d 35, 37 (4th Cir. 1966). However, in the Fourth Circuit, Plaintiff cannot use *contra proferentem* to undermine the discretion conferred by the LTD Plan and the doctrine therefore does not apply here. *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 260 (4th Cir. 2009) (explaining that the "application of [the *contra proferentem*] rule to curb discretion given an administrator by a plan" is "now foreclose[d]"); *Plotnik v. Computer Scis. Corp. Deferred Comp. Plan for Key Executives*, 182 F. Supp. 3d 573, 604 (E.D. Va. 2016) ("*contra proferentem* cannot be used here to undermine [the defendant's] exercise of discretion"), *aff'd*, 875 F.3d 160 (4th Cir. 2017).

decline to recalculate Plaintiff's benefits based on that interpretation. Under the abuse of discretion standard, Defendant "only has to offer a reasonable, and not the most reasonable, interpretation of a plan's terms." *Collins v. Aetna Life Ins. Co. of Am.*, 700 Fed. Appx. 205, 208 (4th Cir. July 6, 2017) (citation omitted). "In reviewing the administrative record, a district court should not disturb a reasonable administrative decision, even if the court itself would have reached a different conclusion." *Hailey*, 2014 WL 5421242, at *3 (citing *Haley v. Paul Revere Life Ins. Co.,* 77 F.3d 84, 89 (4th Cir.1996)). Reasonableness is assessed by "determining whether the administrative decision is the result of a deliberate, principled reasoning process supported by substantial evidence." *Id.* (citing *Evans v. Eaton Corp.,* 514 F.3d 315, 322 (4th Cir.2008)). Courts consider the following nonexclusive *Booth* factors in making this inquiry:

> (1) the language of the plan; (2) the purpose and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Champion v. Black & Decker (U.S.) Inc.,* 550 F.3d 353, 359 (4th Cir.2008) (citing *Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 342-43 (4th Cir.2000)). The Court will primarily consider the language of the LTD Plan, the purpose and goals of the LTD Plan, the adequacy of the materials that Defendant considered in making its decision, and whether the decision-making process was reasoned and principled.

Plaintiff appeals Defendant's decision to decline to recalculate her LTD benefits using her preferred Benefits Base quarterly earnings calculation. Specifically, Plaintiff requested that Defendant use her earnings paid in Q2 2020 to Q1 2021 to recalculate her Benefits Base rather than earnings paid in Q1 2020 to Q4 2020. AR11 n.54; AR10-11 n.55; AR639. In support of this

13

request, Plaintiff asserts that, based on the language of the Plan, LTD benefits are to be recalculated on an ongoing basis – every quarter using the Benefits Base quarterly earnings calculation completed in that new quarter. Dkt. 18 at 7 (explaining that "[i]n Q1 of 2021, Lincoln was required to look back at the last 12 months (January 2020 to December 2020). And, in Q2 of 2021, Lincoln was required to look back at the last 12 months (April 2020 to March 2021)."). In contrast, Defendant interprets the language of the Plan to require a one-time calculation of LTD benefits using the Benefits Base quarterly earnings calculation completed in the quarter prior to one's initial date of disability. AR49-51. Thus, under Defendant's interpretation, the sole applicable Benefits Base quarterly earnings calculation for Plaintiff's LTD claim would be that from Q1 2020 to Q4 2020, or January 2020 to December 2020, because the initial date of her disability was February 7, 2021. AR1.

On appeal, the parties primarily dispute the meaning of the clause "Benefits base is calculated quarterly," which is found in the Group Policy's definition of BME for Job Class Code 1 and 5 employees. Under the Group Policy, an employee who is eligible for monthly LTD benefits can opt to receive either "50% of Basic Monthly Earnings" or "65% of Basic Monthly Earnings." AR1078. Plaintiff, a Job Class Code 5 employee, elected to receive 65% of her BME. AR1-2, 917. For Job Class Code 1 and 5 employees, the Group Policy defines BME as "a benefits base, up to a maximum of $500,000 annually. **Benefits base is calculated quarterly** and earnings are annualized based on base salary and incentives, incentive bonuses and/or commissions paid in the last 12 months, divided by the number of months with earnings greater than $0." AR1081 (emphasis added).

Plaintiff argues that the clause "Benefits base is calculated quarterly" refers to the *time* at which both Benefits Base and, as a result, monthly LTD benefits are to be updated, asserting that

14

Defendant was required to adjust her monthly LTD benefits on an ongoing basis – every quarter when her Benefits Base was updated. AR56. In contrast, Defendant interprets the clause to describe *how* Benefits Base is calculated – by using the pay and incentives earned in the previous 12 months, divided into four quarters. Dkt. 16 at 18-19.

> Benefits Base is not calculated from daily, weekly, monthly, or annual pay. It is calculated quarterly, based upon the pay and incentives paid within the previous 12 months, regardless of whether the date of disability is the first day or the last day of a quarter. 'Benefits base is calculated quarterly' is not a statement as to *when* benefits are calculated for a specific claim.

*Id.* Under this interpretation, the phrase "Benefits base is calculated quarterly" refers to the process of calculating the Benefits Base quarterly earnings, not the timing of LTD benefit recalculations for an individual's claim.

Defendant acknowledges that the Group Policy does not clearly state *when* a Job Class Code 1 or 5 employee's Benefits Base or BME is calculated as it does for Job Class Code 2 employees,[6] but asserts that "using the quarterly Benefits Base in effect on the last day worked is the only reasonable interpretation of the operative plan language." *Id.* at 19. Defendant supports this interpretation by referencing the SPD[7] for the LTD Plan from the Wells Fargo Benefits Book,

---

[6] Unlike the definition of BME in the Group Policy for Job Class Code 1 and 5 employees, the definition of BME for Job Class Code 2 employees states that the calculation of LTD benefits is based on "covered pay in effect on the day before the initial date of the Employee's disability." AR1081.

[7] Statements in the SPD "do not themselves constitute the terms of the plan." *Cigna Corp. v. Amara*, 563 U.S. 421, 438 (2011). However, the SPD is a document required under ERISA to inform plan participants of their rights and obligations under both the plan and ERISA itself. *Pegram v. Prudential Ins. Co.*, No. 3:08CV116, 2009 WL 1974942, at *4 (E.D. Va. July 2, 2009) (citing *Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 26-28 (4th Cir. 1992)). Accordingly, it may serve to clarify the language of a plan when engaging in interpretation of the plan's terms. *See, e.g., Murphy v. Int'l Painters & Allied Trades Industry Pension Fund*, No. 3:13-CV-28760, 2015 WL 13746658, at *14 n.29 (S.D. W.Va. Apr. 16, 2015), *report and recommendation adopted* by 2015 WL 5722809 (S.D.W. Va. Sept. 29, 2015) (noting that SPD supported Trustees' interpretation); *see also Lamb v. Nextel Commc'ns of Mid-Atlantic, Inc.*, No. 4:09cv149, 2010 WL

which "explains [an eligible employee's] benefits and rights under the" LTD Plan in a manner that is "easy to understand." AR1137. The SPD states, *inter alia*:

> **Covered Pay**
> Your LTD benefit is based on your covered pay in effect on the day before the initial date of your disability. . . .
>
> **Benefit Amount**
> LTD benefits are based on your covered pay on the day before the initial date of disability.

AR1189-90, 1221-22. Thus, the SPD aligns with Defendant's interpretation that the LTD Plan provides for a one-time calculation of monthly benefits for a Job Class Code 1 or 5 employee's LTD claim, using the Benefits Base quarterly calculation completed in the quarter prior to one's initial date of disability.

Further, Defendant's interpretation appears to be consistent with the goal of the LTD Plan, which is to provide LTD benefits for an employee who is disabled for more than 26 weeks, for the duration of the Maximum Benefit Period[8] if necessary. AR458, 1086. Defendant contends that Plaintiff's interpretation would lead to "absurd consequences" for Job Class Code 1 and 5 employees; "namely, a decrease of benefits for most participants at the first quarterly update, and for all participants at the second update" because, as commissions-based employees, they would have earned little to no pay during those quarters due to their disability.[9] *Id.* In contrast,

---

4068520, *11-12 (E.D. Va. Aug. 19, 2010), *report and recommendation adopted by* 2010 WL 4068483 (E.D. Va. Oct. 13, 2010) (noting that the SPD may serve to clarify plan language).

[8] The Schedule of Benefits in the Group Policy lays out the Maximum Benefit Periods – the maximum duration for eligible employees to receive LTD benefits under the LTD Plan based on age. AR1079. For instance, the Maximum Benefit Period is 60 months or five years for a 60-year-old employee. *Id.*

[9] Defendant further explains that "[i]n most circumstances, if an employee paid with commissions starts disability leave in the middle of a quarter, consistent with the nature of disability and its impact on work capacity, the employee will earn less commissions, or no commissions, as the condition becomes more disabling. As a result, the disabled worker will earn

Defendant's interpretation ensures that LTD benefits are calculated using the Benefits Base quarterly earnings calculation from the quarter prior to disability, thereby protecting commissions-based employees from the impact of reduced earnings after they are no longer able to work due to their disability.

Based on the language, purpose and goals of the LTD Plan, the Court finds that Defendant's interpretation of the LTD Plan is reasonable and supported by substantial evidence. First, the language of the Group Policy, particularly the phrase "Benefits base is calculated quarterly," can reasonably be interpreted as describing the method of calculating the Benefits Base, rather than describing the timing of recalculating a claimants' monthly LTD benefits. Under Defendant's interpretation, the clause explains *how* the Benefits Base is derived for commissions-based employees – not based on daily, weekly, monthly, or annual pay, but by dividing the year into quarters, selecting the quarter prior to a claimant's initial date of disability, and averaging pay and incentives over the preceding 12 months. By using the Benefits Base quarterly earnings calculation from the quarter prior to the employee's disability, the LTD Plan ensures that an employee's inability to earn commissions after becoming disabled does not affect the calculation of their LTD benefits. And given the absence of clear language in the Group Policy mandating that Defendant recalculate an employee's *LTD benefits* (as opposed to just Benefits Base) every quarter, Defendant's interpretation provides a logical and consistent application of the LTD Plan terms. Second, the SPD reinforces Defendant's interpretation by explicitly stating that LTD benefits are calculated based on the covered pay in effect on the day before the initial date of

---

less incentives to be paid out in the immediately following quarter. Therefore, in most circumstances, Plaintiff's interpretation would result in a **decrease** in BME that would adversely impact variable pay Class 1/5 employees." Dkt. 16 at 21 (emphasis original).

17

disability, without requiring recurring LTD benefit recalculations. *Lamb*, 2010 WL 4068250, *33-34 ("Because the SPD helped clarify the meaning of 'voluntary termination' and this meaning was consistent with the Plan language, the Committee reasonably used the SPD to aid its decision."). Finally, Defendant's interpretation aligns with the purpose and goals of the LTD Plan by ensuring that eligible employees receive stable LTD benefits for the duration of the Maximum Benefit Period (if necessary), without the risk of a reduction in benefits due to an inability to earn commissions post-disability.

In opposition, Plaintiff notes that, in Defendant's initial decision rejecting her request for recalculation of her LTD benefits, Defendant solely quoted provisions from the SPD and not provisions from the Group Policy despite claiming that its "determination reflects an evaluation of the claim facts and Policy provisions only and did not rely on any internal rules, guidelines, protocols, standards or other similar criteria." AR639-40. On appeal of the initial decision, however, Defendant cured this deficiency by relying on language from the Group Policy and supporting its decision with language from the SPD. AR54-56. Thus, during the administrative process, Defendant clearly demonstrated to Plaintiff how it calculated her LTD benefits and provided reasonable explanations for its rejection of Plaintiff's request using the Group Policy and SPD, which are adequate materials on which to base its decision. AR639-40; AR54-58; *Lamb*, 2010 WL 4068250, *33-34. Moreover, Defendant "kept her informed of the status of her request for [the adjustment of her] LTD benefits, notified her of its decision to deny [her request], and notified her of its decision to uphold denial on appeal." *Holder v. Metro. Life Ins. Co.*, No. 6:21-cv-00490-DCC, 2022 WL 4354406, at *6 (D.S.C. Sep. 20, 2022). Defendant therefore "followed a principled and reasoned process for its decision to deny" Plaintiff's request for recalculation of

her LTD benefits. *Id.* (citing *Donnell v. Metro. Life Ins. Co.*, 164 F. App'x 288, 294 (4th Cir. 2006).

Accordingly, the Court holds that Defendant did not abuse its discretion in denying Plaintiff's request to recalculate her LTD benefits because Defendant acted reasonably in interpreting and applying the language of the LTD Plan to Plaintiff's circumstances. Defendant's decision-making process was reasoned and principled in light of its reliance on the language of the Group Policy and accompanying SPD. Thus, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 15) is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment (Dkt. 17) is DENIED; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
September 26, 2024

/s/
Rossie D. Alston, Jr.
United States District Judge